Dearly, dearly, this Honorable Appellate Court for the 2nd Judicial District is now open. The Honorable Anne Lee Jorgensen presiding. Please be seated. Your Honor, the only case on the docket standing is 2-23-0271 Stokovich Family Ltd. Partnership plaintiff appellant, v. Arissa Kaufman as trustee of the Arissa Kaufman Deliverable Trust dated July 16, 2007, defendant's appellee. Arguing on behalf of the defendant, Mr. John L. Twain. Arguing on behalf of the appellee, Mr. Marty J. Schwartz. All right, gentlemen, are you both prepared to proceed? Yes, Your Honor. Then when you're ready. Thank you, Your Honor. May it please the Court. I represent the Stokovich Family Partnership. They own two pieces. They own property in Libertyville that's on St. Mary's Road. It's a vacant lot in a residential area right next door is the defendant's house on a neighboring lot. So the court found that there was an adverse possession. And we're claiming that the trial court made two reversible errors. One was in its application of the presumption of permissive use that applies to vacant and unoccupied land. And then the other error that the trial court made was in the application of the rule concerning open and notorious that is part of an adverse possession case. So with respect to the permissive use, my client's property was vacant, undeveloped. I don't think there's any dispute that my client's property is vacant and undeveloped. And the court found, the trial court did find that the property was vacant and undeveloped. The law is, and this comes from Monroe v. Shrake, in addition to other cases, but it's that the use of vacant and unoccupied land is presumed to be permissive and not adverse. Doesn't that have to do with how the property is used? I don't believe so, Your Honor. I think the idea is, and there's cases that they look to the start of what was the property, what was the state of the property when it started to be used. Well, that's a good question. I mean, the state of the property when these people took over, was there any cut out, was there any area that demarked that this was the Stoikovitch property versus the property that they bought? Well, what the testimony showed was that there was a portion of the unoccupied, a portion of the property of my client that had a shed on it and there was a wire mesh fence and there was mowing and landscaping on that part. However, that's the state that it was in when my clients took possession of the property. They had a predecessor who was their parents who owned the property prior to that and so at some point in time, you know, this landscaping started. At some point in time, the wire mesh fence was there and the shed was put there, but my client's property was always vacant and unoccupied. So when that was put in, it was put in on vacant, unoccupied land and at that moment, the presumption of permissiveness kicks in and the presumption of permissiveness, and this is cited in a few cases, but including that Monroe versus Shade, is that the permissive use never ripens into a prescriptive right no matter the length of time that it's used. So if it was presumed to be permissive at the outset, it continues to be permissive. There's a comment or a statement in Dow versus Ryan that semi-permanent landscaping changes were inconsistent with mere permissive use. And here, I think it's a concern I have. You're right that there is that presumption, you know, no question about it. Although as I read it, it's what I call, I'm not sure if this is an actual legal term, but a burstable presumption. Like the presumption is there, but once there's evidence refuting it, the presumption no longer is maintained. But here, you know, there's the fence, the, to whatever extent it's significant, the shaping of the bushes, the bush line to create that space, but also the shed and the path. Well, I don't think that the use of the land is evidence that rebuts the presumption of permissive use. There's no case law, the rule concerning presumptive use just says that property which is vacant has this presumption. It doesn't say that specific uses, I mean, they could create a presumption of specific use. Like there's a presumption that if you put a fence in, then it's not permissive. We presume that that's not permissive. Can you go from permissive to adverse? I think you could if there was an intervening event. If there was any evidence that they had specifically gone to my clients and requested permission, my clients said no, then that would be an intervening event that would change it from the presumption of permissive to non-permissive. But there's no testimony or evidence of any kind concerning an event like that. So, Elias, don't you think in asking for permission, they're admitting they don't know that? Well, I would agree with that, but my point is simply is that somebody who has presumptive permissive use, they could change their mind, they could decide I'm no longer going to give you permission. And, in fact, that's kind of what happened in my clients filing this case. There was presumptive permissive use, and then my clients told them to get the shed off of their property and the fence, and then they filed this lawsuit. And after how many years did they ask them to take this shed off of the property? They asked them in 2002 when they became aware of it. So once they became aware of it, they asked for it right away. But it would have been presumptive up until that point because... 2022? Yeah, up until 2022. So 20 years later. When the buckthorn loses its leaves or is thinned out during the winter months, wasn't there testimony that this shed could be seen clearly during that period of time? Well, Your Honor, that would go towards the openness and notorious element. And there was testimony that it could be seen just during certain months, just during certain times of day. And, in fact, the witnesses who testified that were from the community or witnesses that were on the road, my clients testified that they drove by the property, they never saw it. And then there was a witness named Mr. Pinter who was from the neighborhood, and he testified, and the court made note of this in its ruling, that at deposition he testified he'd never seen it. But then at trial, he came to trial and explained, well, yeah, now that I'm looking specifically for it, I've seen it, you know, at certain times. He said he had no specific recollection of when he first saw the shed, that it had been on the property since the early 90s. Isn't that what he said? Yes. He said he couldn't recall the exact date when he first saw it.  But he also testified as to the visibility from the road, and what he said was that he didn't notice it from the road until after this lawsuit, and he had reason to start specifically looking for it. His point was, I knew it was there, but if I was driving down the road, maybe you wouldn't see it. Right. And in this case, you probably wouldn't see it. The testimony was all very clear that only under very particular circumstances could a part of the shed be seen. And you had to be in a certain place, and it had to be at a certain time of year, and it had to be at a certain time of day, and none of that's in dispute. What my contention is, is that open and notorious means it doesn't, it's not satisfied by the fact that someone specifically looking, if they're very careful at the right time of day, can search out and see the shed. The point of open and notorious, and what the word notorious means, it means apparent to everyone, generally known. Even definitions include that it's talked about. And specifically in this case, what they're saying is, yeah, all the testimony and all the evidence is essentially that you wouldn't see it normally, that community members wouldn't see it. Mr. Pinter testified that he could see it from his backyard, but that's not, that doesn't mean it's open to the public. I mean, the public at large can't go into his backyard and see the state of the property. And Mr. Pinter also testified that with respect to the wire mesh fence, he testified that he had gone over there on social occasions to the Appellee's house, and even then he couldn't see the fence. And the trial court said, oh, well, the reason why I couldn't see the fence was that the fence was indistinguishable from the buckthorn. It was basically camouflaged by the buckthorn. That's why Mr. Pinter, even though he was there on social occasions, didn't see it. But the court never really took that as a factor concerning open and notorious. And, you know, the case law on open and notorious, it says that for it to be open and notorious, it's like unfurling a flag to the world. And what we have here is not a flag that's on a flagpole visible to everyone who can see it. We have a flag that's maybe behind a tree and is not unfurled. And certain times of the year, and when the light's just right, maybe a corner of the flag will blow out past the tree. And maybe if you happen to be looking at just that moment, you might see the flag there. What did the trial court say that they were waiving the flag for 32 years? What the trial court said was the trial court just determined that at this time, it could be seen if you looked from specific places at specific times of the year. The trial court also talked about the aerial views of the property. What is your response to that? I mean, how are they unable to access that when anyone can access it? Well, I don't think that aerial views should really be used as a factor when it comes to open and notorious. Because open and notorious, the rule is that the community would know of it. And the community is not going to go and, you know, look at these aerial photos. But I guess my concern is you're saying, well, then adverse possession can't exist ever. Kind of. I mean, there would be circumstances where if it's not visible easily from the road, because it is visible from the road, it's visible at certain points. I mean, the testimony is unrefuted about that. I think when you compare it to a case, though, like. . . That what you're saying is it just couldn't happen. And I'm not really sure why, to follow that line, why aerial wouldn't be relevant. It's right there on the GIS or, you know, whatever it is the mapping department is using. If you wanted to check your properties, you could do it. I agree. But there isn't any kind of case law or duty that says a property owner needs to, you know, check aerials. No, there isn't. But there isn't any rule that says if it's not easily visible by everyone who's wandering past the property, then it isn't open and notorious. The trial court found you could see. And then it clearly looked from at least the perspective of the claimant that that carve-out, we'll call it, that it appeared that that was part of her property. And so in that sense, you know, again, not that we take the point of view open and notorious only from the point of view of the claimant. That can't be the rule. But certainly that is relevant. Well, if I could just respond to this one point. I do believe you can still have adverse possession. In fact, you have it in other cases. In Knopf v. Ryan itself, when the court described the visibility, the court said that it was, that there was a stark contrast that was visible. So it wasn't just a contrast. It was a stark contrast. So the court said it was more than even normal. And then they said anybody who's traveling down the road would most likely assume that the landscape strip was part of the property. So my point is, is that, you know, if all these trees and buckthorn weren't there, then it would be like that case where anybody driving down the road would see a clear contrast between the vacant land and Ms. Kaufman's home. But in this case, because of all the trees and all the buckthorn, there is no clear, stark contrast. This is a situation where, you know, there may be a flag, but it's not unfurled. It's furled at best. And, you know, open and notorious should mean more than if somebody goes and gets aerials or somebody goes and enters into the right-of-way or stops their car to get out and specifically look for it, because that puts the cart before the horse. The point is, is that the use of the property is supposed to inform the public that it's being used. It's not that an informed public who already knows it was there could then, knowing what they're looking for, could go out specifically, search it out, and find it. So for that reason, I don't believe the open and notorious element is met, and I think that the court simply did not apply the open and notorious element properly. So basically, your argument comes down to what is the degree of visibility that is necessary for open and notorious. And you're suggesting on one end that it should be, not on one end, but you're suggesting it should be something that is visible and clear to the public, not necessarily the neighbor or someone who would be familiar with the property. Is that true? Exactly, exactly, because the rule is that the community would know. And it should be something more than what was described in this case. Okay. Do you have any further questions? I have none. Thank you. Further questions? Counsel, as you know, you'll have an opportunity for a rebuttal. Thank you, Your Honor. Counsel, when you're ready.  Good morning, Justices. I'd like to say it's a real pleasure to be here. I'm from Cook County, but I enjoyed the trip out here. Nice long drive. There's actually no traffic. I left very early, so. My name is Marty Schwartz. I represent the appellee. I want to sort of remind the court, everyone's aware, that the standard here was the court's factual findings against the manifest weight of the evidence. And every finding by the court, I believe, was a factual finding that was supported by the evidence. I do want to go into the open and notorious. That's where we left off with my opposing counsel there. So the standard isn't, was it seen? The standard is, could someone be apprised, if they were looking for it, could they be apprised that this property belonged to, that the claimant was in possession of this property? Could have been, not actual. And that standard is clearly not. And when counsel's talking about a certain time of day, there's no evidence that only at 3.30 on a full moon, you could see a part of the shed. The photographs are there. In the fall, after the leaves have fallen off in the winter, you could see it. In the summer, you can't. I mean, I could make the same argument that you can see it only during a certain, you know, part of the day. And the fact that you have to be in a certain spot to see it, that's correct. But when you're walking down this road, who's looking into everyone's backyard? I think if that was the standard, that someone actually has to be able to see it without looking for it, then a lot of these adverse possession cases would fail, because how many people, when they're walking down the street, are looking in other people's backyards and what is going on? But just so we're clear, not only was it seen by the, you could see it by the road, and as the quote said, anyone who was walking by on that road would be able to see it. And that includes mail carriers, messengers, FedEx people. And Mr. Pinter, yes, he said in his deposition he didn't see it from the road, because again, why would he be looking? But if he decided to look, you could have been apprised of it, which is the standard. Mr. Pinter also testified he saw it from his backyard. And the plaintiff here testified that he could see it when he walked his property, which he said he did a couple times. He didn't see it, but then after the surveyor brought it to his attention, he walked his property and he saw it. So I think the test for open and notorious is met. The other thing I'll say in almost all the cases, it's sort of an obvious, if you looked at the property, the average person would assume who it belonged to. So there was one case, I think it was Branchhurst, where their lawn extended all the way to the gutters. So someone would assume that they owned the property all the way to the gutters. I think in the Joinder case, there was a clear tree and bush line, which is exactly what's here. And when you look at the photographs, you would assume these two cutouts belonged to the Coffmans. Now, the Coffmans' driveway was on their property, so to speak. And the shed was prior to the end of the driveway, was it not? I think the driveway ended right around the shed. But the whole backyard is sort of an oval. And it extended, there was this wire fence, and it extended. So the Stokkevich property, it was all trees, thick, and then there's these two cutouts. And that's the way it was when the Coffmans bought it. The fence was there. No one would assume that this cutout area belonged to the Stokkevichs, if you just look at it. The cutout that was, I think, east of the shed, where the garage was, again, it was a little cutout. It looks like what it was used for, to park cars and go up to do a turn around. And then the walkway that they installed, I think they testified, the Coffmans, that they installed kind of the stones or something from? Yes, the stones. And perhaps the most revealing was the surveyor's testimony. When he saw it, that brought to his attention that this was an encroachment. He could have, if the stones were turned away, or there's no stones in the shed, I guess he could have assumed that this was part of the Stokkevich property. But he said, no, the steps are going towards the driveway. So it clearly shows an encroachment, what he would do, which he brought to the Stokkevichs' attention. You couldn't see the steps unless you were on the property, correct? Well, the surveyor, I would disagree with you on that. Fair enough. So the surveyor saw it. But to the extent it's relevant, it is visible from some of the map department photos. Yes, and I'll mention it was the plaintiff who introduced those aerial photos. It wasn't the defendants. I find it a little ironic that the plaintiff is complaining you shouldn't look at the aerials. They were the ones who introduced it. If I could move on to the presumption of permission. First of all, for there to be permission, you have to know about it, right? So the plaintiffs testified, we didn't know about this area at all. Obviously, if they had, they would have made a complaint about it. But they testified, both Mr. Stokkevich and I believe it was his sister testified, that they went by this property every week. And Mr. Stokkevich testified not only did he go by it, but he also walked the property. And he never saw it. So how could he have given permission? There's absolutely no testimony at all that permission. And I believe there was the McNeil case that neither party, the parties were mistaken about the boundaries. And the court said, well, clearly the landowner didn't give permission because he didn't think he owned that property. And I think the Brandhurst case also talks about the landowner had moved away after a few years. So they said he probably didn't know that the claimant was using this property. And so that rebuffs the rebuttable presumption of permission. But the court also said, as do a lot of courts, that the presumption doesn't apply if the property is occupied. And I think the standard, the Knopf case said, in the cases where they relied on the presumption, the property was uncultivated, vacant, and unenclosed. Well, here, this property was enclosed with the fence. It was clearly being maintained. You see the lawn, and it's a clear demarcation between the lawn and the trees. The Ceilings case, a third district case, said it's not vacant if it was farmed, maintained, and fenced, which I think applies here. And the Knopf case said, where they put in a rock garden and trees, that was enough to show that it was not vacant. And the other thing that the trial court noted, which obviously I would agree with, but in all the cases relied upon by the plaintiff on this presumption, the landowner had done something to claim ownership. In one case, they tore down the fence that the claimant had made. It put up on the property, and the landowner said, this is my property. In the other case, the landowner went to a hearing before the zoning board and said, I want a variance, and the claimant, or the claimant's predecessor, showed up and objected and said, I objected to him using that land. So he's quite a bit acknowledging, in those cases, the landowner was making a claim to the property, and the claimant didn't do anything to refute it. In that one case where they tore down the fence, the claimant said, okay, and left it alone. You talked about some forfeiture with respect to the, I think it was the parking area. You said that they forfeited that because they really didn't delineate that or just set that out. But the trial court never called anything a parking area. They never distinguished anything about the shed, the parking area, the fence, anything. They just, like, kind of had it all under one umbrella, if you will. How did he forfeit it? Well, Your Honor, he didn't raise any specific issues regarding the parking area. The appellant did not raise any specific argument distinguishing the parking area from the shed. The trial court did specifically The trial court called it the disputed area. Right, but he had specific conversation. She had, in her ruling, she specifically said when the plaintiff walked the property, he could see both the shed and the area, I believe, that's east of the shed. So one, you can't have one without the other as far as the adverse possession, could you? In theory, we could. In practicality, no. Based on the evidence, she treated the evidence all the same. And by the way, the same time in the winter, you could see both the shed and the parking area. It's in the same sort of sight lines. The last point I want to make, which is just sort of a miscellaneous point, but we did cite cases that are directly applicable in the uses here. So the Bradhurst case mentioned how the claimant parked cars on the disputed area and they said that was possession. In the Sierens case, the claimant parked cars on the disputed area. They used a driveway and a shed, which is similar to this case. So unless you have any other questions, I don't have anything else to add. Any additional questions? Thank you. Thank you very much, counsel. Thank you. Justice, now I want to remember you from the trial court, right? Yes, good to see you again. Nice to see you. I'd like to ask your voice first. Good to be known by your voice. Thank you very much. Counsel, do you wish to reply? Yes, ma'am. With respect to the permissive use, counsel said that there can be no permissive use if there is no knowledge, and he points to McNeil v. Ketchins. But that was a case where you weren't dealing with vacant land and you weren't dealing with the presumption. What that case says is that if there's two people, they're neighbors, and both of them are mistaken as to the boundary line, then how can one give the other permission? And that makes perfect sense. But in a permissive use case, there's no case law that says that as a prerequisite for the presumption, you need to show that you actually knew that the property was this way. Then whose burden is it to show that it was permissive? It's the person who's seeking adverse possession. And really, there's two presumptions. There's a general presumption in adverse possession against the person trying to adversely possess, and then there's the specific presumption with respect to the vacant land. So they really need to produce actual evidence that there was no permission, that the permission was withdrawn or wasn't given or something like that. I see your point. I mean, one of the cases makes the comment acquiescence is consistent. Acquiescence is always present with a permissive use. And so the fact that nothing was said doesn't burst that presumption. But I guess one thing counsel did say that I wanted to ask you to address is he seemed to be alluding to the argument that because this was enclosed from this fencing, that, you know, I guess I wonder, is the presumption applicable? Because it's not vacant and not enclosed. I mean, he made that point. Right. I don't think that's how vacant and enclosed is meant to be viewed in the world, in the case law. And there are cases that say, you know, what was the situation at the start? I mean, the presumption would be almost meaningless if the person who's adversely possessing can change the nature of the property through some action and eliminate the presumption. I mean, that wouldn't make sense. The – if – we know that my client's property was always vacant. So at the time that they put the fence on there, it was vacant and permissive. The putting of the fence was presumptively permissive. And it never ripens. That's the case law. It never ripens. I'm not saying it's permanent. There could be a specific event that would change it. But there's been no evidence by – entered at trial that somebody withdrew permission or specifically stated that there was no permission. And with respect to the knowledge, too, it's not just – it's not my clients. If the shed was put on before my clients purchased the property, if the fence was put up before my clients inherited the property, then the question is, well, maybe it was permissive from the predecessor. The predecessor might have given permission. We don't have any testimony whatsoever about what the predecessor's interests when this was actually put up, whether they had permission. Parents. Parents. Oh. Yeah. And they're deceased. And I think part of the reason why you have the presumption is because if you have a use that goes back decades, goes back generations, then, you know, it's the burden of the party seeking to adversely possess to prove that there's no permission. Counsel, let me ask you this then. Are you saying there was no evidence, or are you saying that the findings of the court based on the evidence presented was against the manifest weight of the evidence? Well, I believe that the findings in the court were against the manifest weight of the evidence, specifically in that they applied the wrong law. It's similar to the case, the case, I'm forgetting the name, but there is a case where concerning the open and notorious element, the court said, the trial court essentially used as its definition, and this is what the appellate court said, used as its definition of open and notorious, they used actual knowledge of the title owner, and the court said, well, this rule is against the manifest weight of the evidence because the question isn't whether there's actual knowledge from the title owner. The question is whether or not the community would be apprised. And so with this case, I believe that the court made all kinds of factual findings and included them in the order of what testimony it was based on and whatnot. But, for instance, with regard to the open and notorious, the court always said that, like the court said specifically, based on the testimony of the witnesses and the photographs admitted into evidence, the court finds during late fall, winter, and early spring, with correct lighting, the shed is partially visible from St. Mary's Road. Similarly, the court earlier had said that the photographs show that during spring and summer, the shed's completely hidden by buckthorn, but when the trees lose their leaves during that time frame, the shed is slightly visible through the denuded buckthorn. And so I'm not saying that there's anything wrong with those findings, but when you then take those findings and apply it to open and notorious, what I would say is that if something is partially visible only when the lighting's correct, that doesn't meet the open and notorious standard. So the definition of open and notorious is what's in error by the trial court in this case. But that case, I think, is Justice McClaren's case. That's the one that I at least became aware of, that flag-furling or the flag-planting, because he uses that metaphor there. Yeah, it was an open and notorious case, and he said it wasn't because, one, recreational use was consistent with the presumption, and two, those trails, they really, it was those neighbors, well, I guess they're always neighbors, but in, I think, King County, where they would just use that for recreation. They'd ride their motorcycles on or their ATVs or whatever. Here, I mean, there is this structure and this path, and to whatever extent it's relevant, the fencing. So I see it a little different. Well, in one of the cases, there was a fire pit that was specifically constructed, and the court said that the fire pit didn't prevent the finding. Well, there was no AP there? You're saying no adverse possession in the fire pit case? Yeah, the fire pit didn't create, it wasn't, they found that there wasn't actual possession, and even though, I mean, they used the trails, and even though they constructed a fire pit, the court still didn't find that that was actual possession. But wouldn't that, you know, I don't mean to interrupt, but that's consistent with what Justice McClaren said, which is that recreational use is not equivalent to dominion. So the fire pit, they went over, used the fire pit, maybe they used the trails, it's still sort of consistent with the presumption of permission. Well, I don't mean to interrupt, but, you know, this isn't recreational use. Does that matter? No, I think it matters with the element of actual possession. But if we're talking about the element of permissive use, which goes to whether it was hostile or adverse, so there's the issue of whether you actually possessed. And what the court was saying is that, you know, just using the trails doesn't mean you're actually possessing the property. We're not contending here that they weren't actually possessing this portion of the property. What we're contending is that the use was permissive. And the other thing, you know, just on that point, I mean, the trial court noted that the shed didn't have a permanent foundation. It could be moved. The fence we're talking about is a little chicken wire fence that you could just lift up and move. We're not talking about permanent changes to the land. It's, frankly, if someone, if I had no plans in the next 20 years to develop a piece of property, and I'm, you know, on good terms with my neighbor, neighbor said, hey, can I put my temporary shed here? I might give them permission. It's not permanent. They can move it over. I don't think that the placement of this temporary shed is, I mean, it's certainly not proof that, it's certainly not evidence that the use wasn't permissive. And I don't think, the case law isn't that certain uses are more likely than other uses to be permissive. The case law is that when there's vacant land, then the presumption of permissiveness applies. I mean, you could give someone permission to excavate and pour a foundation for a home, and if you gave permission, that's permissive. So I think that the- Isn't the permissive argument contrary to what the Stojkovic are saying in their complaint, though? I mean, it's inconsistent. Only with the idea that the Stojkovic's that were present, you know, in court to testify, that they didn't know about it, and when they found out about it, they told them to move. That's not, and so at that point, the permissiveness is gone, but that wasn't more than 20 years ago. There's been no evidence of what their parents, whether the parents may have given permission, and the person who had the shed installed was not the appellant, Miss Kaufman. It was her husband. Her husband was also deceased, so there's simply no evidence, one way or the other, of whether there was expressed permission or not back when the shed was put into place, you know, prior to my clients taking over the property. So that means that the presumption is still in place, and it just continues until it's expressly lifted. Any other questions? No other questions. Counsel, as you know, your time was up, but I'll give you a minute to sum up your final thoughts. Well, again, I simply think that there was a presumption in place, that nothing in the record rebuts that presumption, and also that notorious is meant so that the public can see that it makes it available to the world, that a flag is unfurled. And even the trial court itself always, when it said that it was visible, the trial court always put tons of qualifiers that, with the right lighting at the right time of the year, you could just see a part, which means that the visibility here is very minimal and simply not enough to meet an open and notorious standard. So for those reasons, I think that the trial court should be reversed. Thank you. Thank you. Thank you both for your arguments this morning and traveling to Elgin. As Counsel pointed out, we are in recess for the balance of the day, and you will receive a written disposition in due time. All rise.